#26691-a-JKK

**2014 S.D. 29**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

DEREK BOE,                                Defendant and Appellant.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN L. BROWN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

KELLY MARNETTE
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                      and appellee.


BRAD A. SCHREIBER
JOAN BOOS SCHUELLER of
Schreiber Law Firm, LLC
Pierre, South Dakota                      Attorneys for defendant
                                      and appellant.

* * * *

ARGUED ON MARCH 26, 2014

OPINION FILED **05/14/14**

#26691

KONENKAMP, Justice

[¶1.]    Derek Leroy Boe was convicted by a jury of aggravated assault, discharge of a firearm at a car, and possession of a firearm by a prohibited person. On appeal, he asserts, among other things, that the circuit court abused its discretion when it admitted evidence of his 2002 conviction for aggravated assault as other act evidence under SDCL 19-12-5 (Rule 404(b)).

## Background

[¶2.]    Boe and Tabetha Key began a romantic relationship in 2011. They lived together in Boe's home until an argument led Key to move out at the end of the year. Shortly thereafter, on January 21, 2012, Boe planned to spend the day and night at his friend Brad Nystrom's place. Boe was without his children for the weekend and he and Nystrom planned to fix a tractor. While Boe was at Nystrom's, Key called and asked if she could come over. Boe said yes, and around noon, Key arrived. She parked her 1995 GMC Jimmy in Nystrom's shop and began to clean it out.

[¶3.]    At 4:00 p.m., Boe left for town to meet one of his children. He planned to come back and spend time with Key and Nystrom. He told Key that she could stay and continue cleaning out her Jimmy. While Boe was gone, his friend Colin Larson called him to see what his evening plans were. After Boe told him he planned to be at Nystrom's, Larson suggested they have a boys' night. Boe agreed, and Larson drove out to Nystrom's place. Larson admittedly dislikes Key. Once Larson arrived at Nystrom's, he asked Nystrom if he could tell Key to leave.

-1-

Nystrom complied. But Key refused and locked herself and her Jimmy in Nystrom's shop.

[¶4.] At 9:00 p.m., Boe returned. He knew Larson and Key were arguing and that Key refused to leave. Boe tried unsuccessfully to convince Key to leave. Boe decided he would hook a chain between his 1993 GMC Suburban and Key's Jimmy and pull her Jimmy out of the shop. After he got the chain hooked to her vehicle and started pulling, Key rammed her Jimmy into Boe's Suburban. She then drove away, heading north on Nystrom Road. Boe followed her in his Suburban. Key changed course and decided to go south toward the highway. When she turned around, she saw Boe's Suburban blocking the road. She ran into his Suburban, she later claimed, to move him out of the way. After she hit his Suburban, however, she slid into the ditch and her Jimmy became stuck.

[¶5.] Boe later testified that when Key rammed his Suburban for the second time he did not believe she would stop until both vehicles were destroyed. With Key's Jimmy stuck in the ditch, Boe parked his Suburban on the road, grabbed a New England Firearms "Pardner" 20 Gauge Single Shot Shotgun, exited the vehicle, and walked toward Key's Jimmy. He claimed that he intended to use the shotgun to tap on Key's passenger-side window, break the glass, and get Key's attention. Boe thought she would respond by driving to town. Key later testified that when she saw Boe exit his Suburban and walk toward her, she did not see the shotgun. It is undisputed that when Boe was near Key's passenger-side window with the shotgun, it discharged and shattered Key's passenger-side window. Key was injured by flying glass and pellet fragments. She jumped out of her Jimmy and

yelled, "my eyes, my eyes, I can't see." Boe dropped the gun and went to her. He claimed the gun went off accidentally and that immediately afterwards he was concerned for her wellbeing.

[¶6.] After Key calmed down, Boe hooked a chain to Key's Jimmy and pulled it out of the ditch. She drove south on Nystrom Road to the highway and into Pierre. She stopped at a gas station because she was having problems seeing and wanted to get cleaned up. While she was at the gas station, she called Boe and asked for him to come help her. He arrived and took her to his house in Ft. Pierre. There, he removed glass from her face and body. She sent a text message to her mother to come get her. Key's mother arrived and took Key to her home. She spent more time removing glass pieces embedded in her skin. The next day she was on the phone with her brother explaining what happened. Her mother overheard the conversation and insisted that Key call law enforcement authorities. Key did, but called back later and said she did not want to press charges.

[¶7.] Hughes County Deputy Sheriff Bill Gallagher responded to Key's call and met with her at her mother's home. He took pictures of her injuries and took her to the emergency room for medical treatment. Dr. Joseph Villa observed glass-type shard injuries to her face, upper chest, shoulder, arms, and thighs. He removed two foreign objects from her temple and forehead, which were later determined to be lead. Deputy Gallagher had requested assistance with the South Dakota Division of Criminal Investigation. Agent Chad Mosteller met with Key at the emergency room. He took photographs of her injuries and interviewed her.

[¶8.] Agent Mosteller travelled to Nystrom's place, along with Deputy Gallagher and another DCI agent. When they arrived, Boe was there, along with Nystrom, Anna Jensen, and two of Boe's children. Deputy Gallagher spoke with Nystrom while Agents Mosteller and Rechtenbaugh interviewed Boe. Boe told the agents about his argument with Key. He said he pulled Key's Jimmy out of Nystrom's shop and that Key rammed his Suburban. He said Key struck his Suburban a second time, causing her to land in the ditch. Realizing her Jimmy was stuck, Boe said he backed his Suburban up to the side of Key's Jimmy and lowered his tailgate to get the chain to pull her out. As he opened his tailgate, the shotgun fell out of the back of his Suburban, discharged in midair, and shot out Key's passenger-side window.

[¶9.] Boe gave Agent Mosteller permission to retrieve the shotgun from Nystrom's shop, and it was secured as evidence. Boe explained that he had given the shotgun to his daughter as a present for her fourteenth birthday. He had a prior felony that prohibited him from buying or owning a firearm. He had arranged for a friend to buy the shotgun in his friend's name. Boe said that he was familiar with the shotgun and had fired it several times. Agent Mosteller arrested Boe for possession of a firearm by a prohibited person.

[¶10.] At the jail, Agents Mosteller and Rechtenbaugh interviewed Boe a second time. Boe changed his story. This time he told the agents that after Key's Jimmy became stuck, he grabbed the shotgun as he exited his Suburban. He said that he only intended to use the shotgun to tap on Key's passenger-side window, to

get her attention, and convey that he was serious about her leaving. He insisted that his finger was not on the trigger and that the shotgun accidentally discharged.

[¶11.] Boe was charged with aggravated assault in violation of SDCL 22-18-1.1 and possession of a firearm by a prohibited person in violation of SDCL 22-14-15. A grand jury later issued a superseding indictment adding additional charges of attempted first-degree murder in violation of SDCL 22-4-1, SDCL 22-16-4, and discharge of a firearm at an occupied structure or motor vehicle in violation of SDCL 22-14-20. In a Part II Information, the State also alleged that Boe was a habitual offender.

[¶12.] Before trial, the State moved to offer evidence of Boe's 2002 conviction for aggravated assault (domestic violence) as other act evidence under SDCL 19-12-5 (Rule 404(b)). This evidence was relevant, the State asserted, to prove Boe's intent, motive, and absence of mistake or accident. In granting the motion, the circuit court ruled:

> The fact that both instances involve someone with whom he [Boe] was in a relationship with, both of them involved a loaded – well, involved a firearm. I guess I'm not certain whether the handgun was loaded. I am not clear on that. But certainly in the heat of a dispute of some sort he resorted to some type of action which was threatening or perceived to be threatening at least by the victim in the case. I certainly believe it is relevant. And although it's ten years old, I think the similarities are strikingly similar and I think they are relevant to prove motive, intent, and certainly to negate a defense of accident in this case. So I agree it's not particularly relevant as a course of conduct or continuing conduct, but I think in those other issues as to motive and intent it is relevant. And I will find that although it may be prejudicial, it's not unfairly so in the context of this case[.]"

[¶13.]    In the jury trial, Nystrom and Larson testified about what happened at Nystrom's place. Also testifying were Key's mother, the gas station attendant, and two of Boe's children. Dr. Villa testified about Key's injuries. Deputy Gallagher and Agents Mosteller and Rechtenbaugh testified about their investigation, relating Boe's conflicting versions of the incident. Mateo Serfontein, a criminalist and firearms examiner with the DCI, testified that at the time Boe used the shotgun it was fully functioning. The shotgun had an internal safety mechanism to ensure that it could not be discharged without the trigger being pulled. Serfontein listed the steps necessary to fire the gun: put an unfired cartridge in the chamber, close the gun, cock the hammer back, and pull the trigger. According to Serfontein, it would be visually obvious when the hammer was pulled back. It would stay cocked until the trigger was pulled. He tested the gun in varying scenarios and confirmed that it would not fire without the trigger being pulled. He found no sign that the gun had malfunctioned on January 21, 2012. Serfontein was also trained as a crime scene investigator. He testified that although he was unable to determine exactly how far the barrel of the gun was from the Jimmy when it fired, it was in close proximity. Also, the shot came within inches of Key as she sat in the driver's seat.

[¶14.]    In her testimony, Key confirmed that she ran into Boe's Suburban twice. She did not see Boe with a shotgun, but only saw him getting out of the Suburban. She admitted that since the investigation started that she had gone back and forth between cooperating and not cooperating with the State because of her feelings for Boe.

[¶15.] The State called Jenny Ponca, the victim of Boe's 2002 aggravated assault (domestic) violence conviction. Ponca, the mother of four of Boe's children, recounted that while she and Boe were in a relationship and living together, they attended a social gathering at Boe's mother's home. Boe was intoxicated. Ponca and Boe argued because Ponca wanted to leave. Boe was showing off to his friends. He had a gun, and when Ponca tried leaving, he hit her on the head twice with it. It was unloaded. Ponca suffered a concussion. Boe pleaded guilty to aggravated assault (domestic violence) and served four years in prison. His judgment of conviction was admitted in evidence.

[¶16.] Boe's trial testimony was consistent with his statement in the second law enforcement interview. He could not recall exactly why he put the shotgun in his Suburban that day. In explaining his decision to hook a chain to Key's Jimmy and pull it out of Nystrom's shop, Boe testified, "I was willing to drag her car all the way to the highway if she didn't want to leave, to get her off the property." When her Jimmy became stuck, Boe believed "she's obviously not going to stop until both cars are completely destroyed. I'm thinking I need to stop her. I just immediately grabbed the shotgun and I get out, still facing west. You know, it happened pretty fast. I just grabbed the shotgun and I'm not – and I'm thinking I need to bust her windows out because it's cold, so that she'll go to town." He said that he did not point the gun at the Jimmy, but when he struck the window with the shotgun "it flashed, boom." He did not want the gun to go off and was shocked that it did. He maintained that he did not have his finger on the trigger. He insisted it was an accident. On cross-examination, he confirmed that he told Agent Mosteller that he

had never been "so effing mad and effing pissed off at a woman" in his whole life as he had been with Key that day.

[¶17.] The jury acquitted Boe of attempted first-degree murder and found him guilty of aggravated assault (domestic violence) in violation of SDCL 22-18-1.1(2), discharge of a firearm at a motor vehicle, and possession of a firearm by a prohibited person. Boe admitted to being a habitual offender. The circuit court sentenced him to twenty years imprisonment for both the aggravated assault and discharge of a firearm convictions and three years for possessing a firearm, all to be served concurrently. Boe appeals asserting that the circuit court abused its discretion when it admitted evidence of his 2002 conviction as other act evidence under SDCL 19-12-5 (Rule 404(b)) and that there was insufficient evidence to sustain his conviction for aggravated assault.

## Analysis and Decision

[¶18.] Boe contends the fact that he struck a previous girlfriend with an unloaded gun in 2002 does not tend to make it more probable that he intended to fire a loaded shotgun and injure Key in 2012, and therefore, the evidence of his 2002 conviction was not relevant to any material fact in the charged crime. He argues that although he was involved in a romantic relationship with both victims, the similarities between the 2002 and 2012 incidents end there. Specifically, he asserts that when he injured Ponca in 2002, he was intoxicated and showing off in front of his friends, but when he injured Key, he was sober, alone with Key, and at no time attempted to strike her with the shotgun, loaded or unloaded. Relying on these

"marked dissimilarities," Boe maintains that the other act evidence was offered only to prove propensity, and therefore, unfairly prejudiced him.

[¶19.] For its part, the State argues that the 2002 incident and current incident involve similar crimes and similar victims and that the 2002 incident was relevant to prove Boe's motive, intent, and the absence of mistake or accident. The State asserts that in both incidents Boe became angry at his then-girlfriend (similar victims) and used a firearm to induce compliance, and in so doing injured his victims (similar crimes).

[¶20.] Our review of a trial court's decision to admit other act evidence under SDCL 19-12-5 (Rule 404(b)) is for an abuse of discretion. *State v. Wright*, 1999 S.D. 50, ¶ 12, 593 N.W.2d 792, 797 (citations omitted). Only when other act evidence is offered to prove character is the evidence inadmissible. *Id.* ¶ 13. As we said in *Wright*, "under § 404(b) other act evidence may not be admitted if its sole purpose is to establish an inference from bad character to criminal conduct. It is admissible when similar in nature and relevant to a material issue, and not substantially outweighed by its prejudicial impact. The degree of similarity required for other act evidence will depend on the purpose for which it is offered." *Id.* ¶ 16.

[¶21.] Here, the State offered the other act evidence to negate Boe's claim that the shotgun fired accidentally, that he did not intend to harm Key with the shotgun, and that he had no motive to harm her. Evidence of a prior crime can also demonstrate a defendant's motive to commit the current crime or demonstrate the existence of a motive when there is a relationship between the victims. *State v. Lassiter*, 2005 S.D. 8, ¶¶ 21-24, 692 N.W.2d 171, 177-79. Before admitting other act

evidence under SDCL 19-12-5 (Rule 404(b)), the court must use a two-step analysis: (1) is the evidence relevant to an issue other than character? and (2) is the probative value substantially outweighed by the danger of unfair prejudice? *Wright*, 1999 S.D. 50, ¶ 17, 593 N.W.2d at 800 (citing *State v. Ondricek*, 535 N.W.2d 872, 873 (S.D. 1995)).

[¶22.] In answering the first question, the circuit court concluded that Boe's previous act of assaulting a girlfriend with a gun when he was angered with her was relevant to prove the material fact that Boe had the motive and intent to harm Key with the shotgun and that harming Key was not an accident or mistake. The court further ruled that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Moreover, the court instructed the jury that the evidence of the 2002 conviction could only be used to "show motive, intent, and absence of mistake or accident." The jury was also instructed that it "may not consider it as tending to show in any other respect the defendant's guilt of the offense with which the defendant is charged."

[¶23.] In this appeal, Boe bears the burden of proving that the court abused its discretion when it admitted this evidence, and that the admission was unfairly prejudicial. *See State v. Dubois*, 2008 S.D. 15, ¶ 19, 746 N.W.2d 197, 204 (citation omitted). On the question of relevance, the record shows a similarity between the victims and the crimes sufficient to support the court's decision to admit the evidence to prove intent and to negate Boe's claims of accident and mistake. "A prior act admitted to show guilty knowledge need not be identical to the crime charged. It need only be 'reasonably related to the offending conduct.'" *State v.*

*Lodermeier*, 481 N.W.2d 614, 625 (S.D. 1992) (citation omitted). Both incidents involved a female victim in a relationship with Boe and a victim who was not complying with Boe's wishes. Boe used a firearm in both incidents. In the first incident, in 2002, he used a pistol to make his then-girlfriend listen to him and comply with his orders, resulting in injury to her. That this incident did not involve a loaded gun or the discharge of a gun does not erase the relevancy of the evidence. As it pertained to the current charge, the question was whether this prior act had a tendency to make it more probable or not that Boe attempted to cause, or knowingly caused, bodily injury to Key with a dangerous weapon. The court did not abuse its discretion when it ruled that the 2002 other act evidence was relevant under SDCL 19-12-5 (Rule 404(b)).

[¶24.]     After other act evidence is deemed relevant, the next inquiry obliges the court to balance the probative value of the evidence against its potential for unfair prejudice. *Wright*, 1999 S.D. 50, ¶ 17, 593 N.W.2d at 800. Boe contends the prejudice is unfair, in part from a potential juror's response to hearing about the conviction during voir dire and in part because the 2002 conviction was too remote. Admission of other act evidence may result in some prejudice, but to be inadmissible that prejudice must be unfair. Here, Boe has not established that the evidence allowed the jury to be persuaded by illegitimate means. *See State v. Smith*, 1999 S.D. 83, ¶ 19, 599 N.W.2d 344, 349-50. The potential juror who was concerned with Boe's prior conviction was dismissed for cause. The empaneled jury was specifically instructed that it could only consider the evidence for deciding motive, intent, and absence of mistake or accident. Here, the crux of the case was

Boe's mental state — did he intend to harm Key with the shotgun or was it an accident? *See State v. Owen*, 2002 S.D. 42, ¶ 46, 643 N.W.2d 735, 749. Indeed, in his defense he insisted that the shotgun fired accidentally. Thus, whether Boe's assault on Key was unintended was open to inference and the use of the 2002 incident could assist in showing an absence of mistake or accident. Moreover, although Boe's 2002 conviction was nearly ten years old, Boe was sentenced to prison for four years during that time. *See State v. Moeller,* 1996 S.D. 60, ¶ 185, 548 N.W.2d 465, 505 (Gilbertson, C.J., concurring in part and dissenting in part) (defendant's period of incarceration taken into account) (citations omitted).

[¶25.]     Nonetheless, Boe contends that this Court's decision in *State v. Chamley* guides our analysis here. 1997 S.D. 107, ¶ 12, 568 N.W.2d 607, 612. *Chamley* is distinguishable for several reasons. First, the prior acts there were offered in part to prove absence of mistake or accident, yet the defense was not based on mistake or accident, but a denial of the charged acts. Second, unlike our case, the prior acts in *Chamley* were twelve to twenty years old. Third, on the issue of intent, the *Chamley* Court found a critical lack of similarity between the charged offenses and the prior acts. In our case, as we have said, there was sufficient similarity with the prior act. Fourth, at least twice *Chamley* cited and applied the wrong legal standard: "whether the probative value of the proffered evidence substantially outweighs the danger of unfair prejudice." *Id.* ¶¶ 10, 16. That is backwards. *Id.* ¶ 57 (Gilbertson, C.J., dissenting). We take this opportunity to overrule this erroneous language. The correct test, as stated in SDCL 19-12-3 (Rule

403), is whether the "probative value is substantially outweighed by the danger of unfair prejudice . . . ." The decision in *Chamley* provides no assistance to Boe.

[¶26.] Boe next claims that there was insufficient evidence to support the jury's guilty verdict on the charge of aggravated assault (domestic violence). He contends that because he and Key were the only witnesses to the events and both agreed that Boe did not intend to injure Key, there was insufficient evidence for the jury to conclude that Boe attempted to cause, or knowingly caused, bodily injury to Key with a dangerous weapon. He points out the fact that he went to Key's aid after she was injured, conduct inconsistent with someone wanting to cause injury.

[¶27.] Sufficiency of the evidence challenges raise questions of law reviewed de novo. *State v. Wheeler*, 2013 S.D. 59, ¶ 7, 835 N.W.2d 871, 873 (citing *State v. Jucht,* 2012 S.D. 66, ¶ 18, 821 N.W.2d 629, 633). "In measuring the sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83 (quoting *State v. Klaudt*, 2009 S.D. 71, ¶ 14, 772 N.W.2d 117, 122). "No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt." *State v. Shaw*, 2005 S.D. 105, ¶ 44, 705 N.W.2d 620, 632 (citation omitted).

[¶28.] To convict Boe of aggravated assault under SDCL 22-18-1.1(2), the jury was required to find beyond a reasonable doubt that Boe attempted to cause, or knowingly caused, bodily injury to Key with a dangerous weapon. Aggravated

assault is a general intent crime; the State was required to prove that Boe had the intent to do the physical act, or perhaps, recklessly did the physical act, which the crime requires. *See State v. Barrientos*, 444 N.W.2d 374, 376 (S.D. 1989). It is undisputed that Boe fired a gun into Key's Jimmy while Key was sitting in the driver's seat and that she was injured as a result. To prove that the gun did not fire accidentally, the State offered testimony through a firearms expert. He testified that the gun had an internal safety mechanism to prevent accidental discharge and that there was no sign it had malfunctioned on January 21, 2012. The expert explained that in order for the shotgun to fire, the hammer must be pulled back and the trigger must be pulled. He tested the shotgun to see if it would discharge accidentally without pulling the trigger and opined that the gun would not accidentally discharge. The jury also heard evidence that Boe was angrier than he had ever been at a woman, that he intended to use the gun to break out Key's window, and that he would have done anything to get her to leave Nystrom's place that evening to let the boys have their night. Therefore, although Boe insisted that the gun fired accidentally and that he had no intent to harm Key, there was sufficient evidence to support the jury's verdict.

[¶29.]    Affirmed.

[¶30.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.