#26885-r-GAS

**2015 S.D. 72**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

ALFREDO L. VARGAS,                        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JANINE KERN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CAROLINE SRSTKA
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                        and appellee.

JAMY PATTERSON of
Pennington County Public
 Defender's Office
Rapid City, South Dakota                  Attorneys for defendant
                                        and appellant.

* * * *

ARGUED ON MAY 27, 2015

OPINION FILED **08/19/15**

#26885

SEVERSON, Justice

[¶1.]     A jury found Defendant, Alfredo Vargas, guilty of attempted fetal homicide. He appeals, alleging that attempted fetal homicide is a legal impossibility and that the circuit court made erroneous evidentiary rulings. We reverse.

## Background

[¶2.]     A jury found Defendant guilty of attempted fetal homicide. During the trial, the jury heard from Lisa Komes. Komes testified that she learned that she was pregnant with Defendant's child in February of 2010. She told Defendant about her pregnancy, and he indicated that he wanted her to obtain an abortion. Komes did not want to be pregnant at that time, but she did not want an abortion either. Their relationship suffered as a result of "the elephant in the room." She explained it was not unusual for him to buy her fountain drinks, but on one occasion after becoming pregnant she noticed that a drink he gave her tasted bitter. She disregarded it as "watered down . . . or something," and threw the cup and drink away. A similar incident occurred one morning when Defendant brought her a fountain drink with white powder on the bottom of it. When she was done with the drink, Defendant rinsed the cup out and threw it away. Again, this drink tasted bitter. The next time he brought her an unusual drink it smelled "minty, and it tasted terrible." She called law enforcement, telling officers that she believed her boyfriend was poisoning her. Law enforcement took the drink. One more time, Defendant brought Komes a drink at work, and again she turned it over to law

enforcement. She never felt sick from any of the drinks, and her baby was born healthy on October 5, 2010.

[¶3.]		Maggie Toavs was Defendant's sister-in-law at the time of trial. She testified that in April 2010, she told Defendant she wanted blue cohosh to help her induce labor. She was over eight months pregnant at that time and had just been released from the hospital for preterm labor. Defendant told her that he had some, and Toavs, along with her daughter, went to his house to obtain the cohosh. While Toavs and her daughter were at his house, he initially told them that he had the cohosh for his friends who did not want to have a baby. At some point during the exchange, he told them he had it for Komes and his baby. He told Toavs that he was putting the substance in Komes's drinks. Toavs assumed that Komes had consented to adding the substance to her drinks. Toavs took some of the substance from Defendant, but did not remember looking at the bottle to see what it was that he offered her. She returned home and tried the substance in a drink but could not drink all of it because it "tasted really bitter." Toavs' daughter testified similarly.

[¶4.]		At the time of these incidents, Defendant was married to Melissa Vargas. A phone call between Defendant and his wife was played at trial. At one point in the conversation his wife asked: "Yeah, but you said when you were giving it [referring to pennyroyal] to her at her house, she was just leaving the drink. Did you spill 'em out?" Defendant responded: "I only gave her two and . . . if she didn't drink it I would . . . spill 'em out. I would rinse it out. She never had anything. She had one drink that she took that she had at work, that's it."

[¶5.]        Roger Mathison testified as an expert in chemistry; he is a chemist at the State Health Lab in Pierre, South Dakota.  He testified to the contents of the drinks that Komes gave to law enforcement.  The liquids were stored in two different containers; one was in a large can, and the other was in a small can.  The liquid contained in the larger can contained 141 milligrams of pulegon per liter.  Pulegon is a constituent of the mint family.  He did not have a way to determine exactly what oil or plant material the pulegon may have originated from.  He did not know if it was peppermint, spearmint, or pennyroyal.  According to his tests, there was nothing unusual in the smaller can of liquid.

[¶6.]        Richard Wold is a forensic examiner with the Rapid City Police Department.  He testified as an expert in forensic examination.  He tested the same liquids that Mathison tested, but he did not discover pulegon in either liquid.  Instead, Wold found terpin hydrate in the liquid in the smaller can.  Terpin hydrate is an over-the-counter cough suppressant, but it is no longer used in cough medicine.  It is not in the same family as pulegon.  Wold found nothing in the substance contained in the larger can.

[¶7.]        Scott Phillips, a medical toxicologist, testified that pulegon can be extracted from the plant pennyroyal.  He also testified that pennyroyal is part of the mint family, and that the "American variety is a little bit more bitter mint type of taste . . . versus the European variety, which isn't quite as bitter."  Pennyroyal is both a food and supplement and is not regulated by the Federal Drug Administration.  He testified that it is primarily used for simple things such as upper respiratory tract inflammation.  It has also been used to bring on menstrual

periods and as an abortifacient. Ingestion of the substance can cause an irritated stomach, nausea, and vomiting, depending on the amount ingested. In large amounts it can cause kidney failure and liver failure, both of which can lead to bleeding, seizures, and comas. He testified that the literature regarding its use as an abortifacient is vague, but some literature indicates that it causes uterine contractions as would occur in labor. Other literature suggests that the liver damage leads to abortion or that it causes slight sloughing of the uterine lining. He opined that it was probably a combination of all of those things that lead to an abortion. He concluded that if taken in sufficient quantities, pennyroyal in its pure form could lead to an abortion, but it would lead to sickness and illness in the pregnant woman as well.

[¶8.]       Phillips also testified about cohosh. He testified that black cohosh[1] is an herb in the buttercup family and has been used by herbalists over the years to treat perimenopausal symptoms. It has a very bitter type of flavor. He testified that "some have suggested its use as an abortifacient, but probably not as commonly as pennyroyal oil or some of the other ones." An adult that ingested a small amount, such as one capsule, might not see any symptoms.

[¶9.]       Defendant appeals the jury verdict asserting: (1) attempted fetal homicide is a legal impossibility, (2) Defendant's spousal privilege and right to confrontation was violated by admission of the taped conversation between him and his wife, (3) the circuit court abused its discretion by admitting 404(b) evidence, (4)

---

1.      The terms black cohosh and blue cohosh were used interchangeably throughout the case.

the circuit court abused its discretion by admitting the State's experts, and (5) there was insufficient evidence to convict Defendant.

## Analysis

*Attempted fetal homicide*

[¶10.]	Defendant asserts attempted fetal homicide is a legal impossibility because it does not require a specific intent to kill. Further, that in this case the jury was not properly instructed on that element of the offense. Defendant proposed an instruction that would require the jury to find that Defendant intended to cause the death of the "fetus," therefore he has preserved this error for appeal.

[¶11.]	South Dakota does not have a statute specifically defining attempted fetal homicide. South Dakota's attempt statute, SDCL 22-4-1, provides in part:

> Unless specific provision is made by law, any person who attempts to commit a crime and, in the attempt, does any act toward the commission of the crime, but fails or is prevented or intercepted in the perpetration of that crime, is punishable for such attempt at maximum sentence of one-half of the penalty prescribed for the underlying crime.

Fetal homicide is enumerated in SDCL 22-16-1.1:

> Homicide is fetal homicide if the person knew, or reasonably should have known, that a woman bearing an unborn child was pregnant and caused the death of the unborn child without lawful justification and if the person:
>
> (1) Intended to cause the death of or do serious bodily injury to the pregnant woman or the unborn child; or
>
> (2) Knew that the acts taken would cause death or serious bodily injury to the pregnant woman or her unborn child; or
>
> (3) If perpetrated without any design to effect death by a person engaged in the commission of any felony.
>
> Fetal homicide is a Class B felony.

> This section does not apply to acts which cause the death of an unborn child if those acts were committed during any abortion, lawful or unlawful, to which the pregnant woman consented.

"[T]o prove an attempt, 'the prosecution must show that defendant (1) had the specific intent to commit the crime, (2) committed a direct act toward the commission of the intended crime, and (3) failed or was prevented or intercepted in the perpetration of the crime.'" *State v. Reed*, 2010 S.D. 66, ¶ 7, 787 N.W.2d 1, 3 (quoting *State v. Disanto*, 2004 S.D. 112, ¶ 15, 688 N.W.2d 201, 206).

[¶12.]     At issue in this case is the first of the three elements that the State must prove—Defendant "had the specific intent to commit the crime" of fetal homicide. "Specific intent has been defined as meaning some intent *in addition to the intent to do the physical act which the crime requires*, while general intent means an intent to do the physical act or, perhaps, recklessly doing the physical act which the crime requires." *State v. Rash*, 294 N.W.2d 416, 417 (S.D. 1980) (quoting *People v. Lerma*, 239 N.W.2d 424, 425 (Mich. App. 1976)) (emphasis added). "To commit murder, one need not intend to take life; but to be guilty of an attempt to murder, he must so intend. It is not sufficient that his act, had it proved fatal, would have been murder." *State v. Lyerla*, 424 N.W.2d 908, 913 (S.D. 1988) (quoting *Merritt v. Commonwealth*, 180 S.E. 395, 399 (Va. 1935)).

[¶13.]     Defendant was convicted under the first subsection of SDCL 22-16-1.1. According to that subsection—assuming the woman has not consented to an abortion—if someone has knowledge that a woman is pregnant, intends "to cause the death of or do serious bodily injury to the pregnant woman or the unborn child," and "cause[s] the death of the unborn child without lawful justification" then that

person is guilty of fetal homicide. SDCL 22-16-1.1(1). However, in order to be convicted of *attempted* fetal homicide, the person needs more than to intend to do serious bodily injury; the person needs to intend the underlying crime. "Generally, 'in the typical case of a criminal attempt, the factor distinguishing the attempt from the completed crime is that the *intended* criminal *result*, an element of the completed crime, *was not achieved.*'" *State v. Charger*, 2000 S.D. 70, ¶ 33, 611 N.W.2d 221, 228 (quoting *Brown v. State*, 550 So. 2d 142, 143 (Fla. Dist. Ct. App. 1989)) (emphasis added). Without more, intent to inflict bodily injury, where none results, is simple assault. SDCL 22-18-1(1) ("Any person who attempts to cause bodily injury to another and has the actual ability to cause the injury . . . is guilty of simple assault."). Therefore, in the context of attempted fetal homicide, intent to do serious bodily injury is simply "the intent to do the physical act which the crime requires" and does not meet the element of specific intent. *Rash*, 294 N.W.2d at 417. Instead, the State must prove Defendant intended death of the unborn child.[2]

---

2.     *See also State v. Coble*, 527 S.E.2d 45, 48 (N.C. 2000) ("The crime of attempt requires that the actor specifically intend to commit the underlying offense. It is logically impossible, therefore, for a person to specifically intend to commit a form of murder which does not have, as an element, specific intent to kill. As the United States Supreme Court stated, 'Although a murder may be committed without an intent to kill, attempt to commit murder requires a specific intent to kill.'" (quoting *Braxton v. United States*, 500 U.S. 344, 351, 111 S. Ct. 1854, 1859, 114 L. Ed. 2d 385, 393 (1991))); *United States v. Kwong*, 14 F.3d 189, 195 (2d Cir. 1994) (recklessness will not suffice for attempted murder; there must be specific intent); *State v. Taylor*, 683 So. 2d 1309, 1314 (La. App. 3 Cir. 1996) (crime of attempted manslaughter requires specific intent to kill, even though such an intent is not necessary to support a manslaughter conviction).

[¶14.] Defendant cites to the case of *Lyerla* to assert that the crime of attempted fetal homicide cannot exist. 424 N.W.2d at 913. In *Lyerla*, we decided that the crime of attempted second-degree murder does not exist in South Dakota. *Id.* However, in *Lyerla* we addressed the conflict between the required specific intent for an attempt and the intent required to commit second-degree murder. *Id.* at 912. We explained that attempted second-degree murder would require that "one must intend to have a criminally reckless state of mind, i.e. perpetrating an imminently dangerous act while evincing a depraved mind, regardless of human life, but without a design to kill any particular person." *Id.* "The words 'attempt' and 'negligence' are at war with one another; they are internally inconsistent and cannot sensibly coexist." *Id.* at 913 (quoting *People v. Hernandez*, 614 P.2d 900, 901 (Co. 1980)). "One may not intentionally attempt to cause the death of another by a reckless act." *Id.* (quoting *People v. Perez*, 437 N.Y.S.2d 46, 48 (N.Y. Sup. Ct. 1981)). In this case, we are not faced with inconsistent mens rea requirements because SDCL 22-16-1.1(1) does not require any mental state other than intent.[3] Contrary to Defendant's assertion, attempted fetal homicide can exist under the first part of subsection 1, which requires intent to cause death. However, the State must prove more than stated in the second part of subsection 1, which only requires intent to do

---

3.      SDCL 22-1-2(1)(b):

> The words, "intent, intentionally," and all derivatives thereof, import a specific design to cause a certain result or, if the material part of a charge is the violation of a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, a specific design to engage in conduct of that nature[.]

serious bodily injury. It must prove the intent to cause death of the unborn child, because without such there is not intent to commit the crime of fetal homicide.[4]

[¶15.] Lastly, Defendant alleges that attempted fetal homicide is an impossibility because the Legislature chose to include the element of death in the statute by stating "[h]omicide is fetal homicide if the person knew . . . a woman . . . was pregnant *and caused the death of the unborn child*[.]" SDCL 22-16-1.1 (emphasis added). Defendant points out that the element of death is already included in the definition of homicide: "the killing of one human being, including an unborn child, by another." SDCL 22-16-1. Thus, Defendant contends that the "caused . . . death" element in SDCL 22-16-1.1 will be rendered surplus language if we recognize the existence of attempted fetal homicide. Defendant asserts that, instead, the inclusion of the "caused . . . death" element in SDCL 22-16-1.1 indicates that the Legislature did not mean for the crime of attempt to apply to the fetal homicide statute.

[¶16.] We do not think that the Legislature meant to render the attempt statute inapplicable to fetal homicide by enumerating the requirements of the crime even though the Legislature has arguably already done so in the general homicide statute by stating that "homicide is . . . killing[.]" SDCL 22-16-1. "[I]n construing statutes together it is presumed that the [L]egislature did not intend an absurd or unreasonable result." *Martinmaas v. Engelmann*, 2000 S.D. 85, ¶ 49, 612 N.W.2d 600, 611 (quoting *Moss v. Guttormson*, 1996 S.D. 76, ¶ 10, 551 N.W.2d 14, 17).

---

4. The issue of whether attempted fetal homicide exists under subsection (2) or (3) is not before this Court, and we do not address it.

Further, even if we agreed with Defendant, it is unclear what the result would be. Under Defendant's theory, the State could still charge an individual with an attempted homicide for an unborn child; it would just have to do so under SDCL 22-16-1 rather than 22-16-1.1.

[¶17.] Because attempted fetal homicide does exist in South Dakota, we next consider whether Defendant was properly convicted. The two relevant jury instructions in this case are No. 21 and No. 24. Instruction No. 21 provided:

> The elements of the crime of Attempted Fetal Homicide, each of which the State must prove beyond a reasonable doubt, are that at the time and place alleged:
>
> > 1. The Defendant with knowledge wherein the Defendant should have reasonably known that Lisa Komes bearing an unborn child was pregnant;
> >
> > 2. The Defendant attempted to cause the death of the unborn child;
> >
> > 3. Without justification
> >
> > 4. Wherein, that Defendant intended to cause the death or do serious bodily injury to Lisa Komes or the unborn child.

Instruction No. 24 stated:

> In the crime of Attempted Fetal Homicide, there must exist in the mind of the perpetrator the specific intent to cause the death *or* do bodily injury to the pregnant woman or the unborn child.
>
> If specific intent did not exist, this crime has not been committed.

(Emphasis added.) The instructions provided to the jury removed the required element of specific intent to cause the death of the unborn child because the jury could have found Defendant guilty of attempt by finding that he had the specific intent to do serious bodily injury rather than finding that he had the intent to cause

-10-

death.[5] The State argues that "[b]ecause Defendant intended to cause the death of his unborn child, the first portion of the statute applied." However, the jury returned a general verdict form finding the Defendant guilty of attempted fetal homicide. This Court cannot determine, based on the verdict form, whether the jury found that Defendant intended to cause the death of the unborn child or whether the jury only found that he had the intent to commit serious bodily injury. Therefore, Defendant was improperly convicted of the crime of attempted fetal homicide because the jury did not have to find that he had the specific intent to cause the death of the unborn child—an element which the State has the burden to prove.

*Recorded phone call*

[¶18.] Defendant also asserts that the circuit court erroneously admitted a phone conversation between Defendant and his wife. We agree. Defendant's wife called Defendant with a detective in her presence to listen and record the conversation. The circuit court admitted the phone call, finding that spousal privilege was waived because Defendant's wife consented to the recording by the

---

5. Defendant's proposed instruction provided:

> In the crime of Attempted Fetal Homicide, there must exist in the mind of the perpetrator the specific intent to cause the death or do bodily injury to the pregnant woman or the unborn child, *intending to cause the death of the fetus.*

> If specific intent did not exist, this crime has not been committed.

(Emphasis added.)

detective who was also listening to the conversation. Further, it found an exception in SDCL 19-19-504(d)[6] to apply.[7]

[¶19.] We review evidentiary rulings under an abuse of discretion standard. *State v. Talarico*, 2003 S.D. 41, ¶ 35, 661 N.W.2d 11, 23. "However, 'when we are asked to determine whether the circuit court's order violated a statutory privilege, it raises a question of statutory interpretation requiring de novo review.'" *Andrews v. Ridco*, 2015 S.D. 24, ¶ 14, 863 N.W.2d 540, 546 (quoting *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 2009 S.D. 69, ¶ 47, 771 N.W.2d 623, 636) (citation omitted). South Dakota's statute on spousal privilege provides: "An accused in a criminal proceeding

---

6. The Code Commission, with the approval of the Supreme Court, renumbered the sections in SDCL chapters 19-9 to 19-13, inclusive, and 19-14 to 19-18. The current code section is cited in this opinion unless otherwise noted. Therefore, "subdivision 19-19-504(d)" is substituted for "§ 19-13-15" to reflect the transfer of § 19-13-15 to subdivision 19-19-504(d).

7. Defendant contends that "[t]he parties had all agreed at the March 27, 2013 hearing that the spousal privilege precluded admission of the conversation at issue." However, it is unclear what agreement there may have been between the parties. The following discussion of spousal immunity occurred at the March 27, 2013 hearing:

> **State:** The State does not intend to bring up any statements from his – I'm not certain if they are ex-wife or soon-to-be ex-wife. We don't plan to bring that up. Obviously in rebuttal, something comes to pass, you know, she will be here so maybe we can approach that with the State.
>
> **Court:** State versus Hart and State versus Witchey are two of the controlling cases on spousal immunity and a privilege.
>
> **Defense counsel:** Right. And there is just – yeah, there was an agreement.

After the foregoing exchange, defense counsel moved on to other matters.

has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse." SDCL 19-19-504(b). "A communication is confidential if it is made privately by any person to his or her spouse during their marriage and is not intended for disclosure to any other person." SDCL 19-19-504(a). There is no question that the communication at issue was made to Defendant's spouse during marriage. Further, the State does not contend, nor do we find evidence that Defendant knew or should have known that his conversation "would be overheard or monitored and would not be private." *See State v. McKercher*, 332 N.W.2d 286, 288 (S.D. 1983). Likewise, there is no indication that Defendant intended it "for disclosure to any other person." *See* SDCL 19-19-504(a). Therefore, it was "made privately by" Defendant. *Id*. As a result, the communication was confidential under Rule 504(a), and Defendant "ha[d] a privilege to prevent his spouse from testifying[,]" unless an exception applied under Rule 504(d). SDCL 19-19-504(b). SDCL 19-19-504(d) sets forth the statutory exceptions to the marital communication:

> There is no privilege under this section in a proceeding in which one spouse is charged with a crime against the person or property of:
>> (1) The other;
>> (2) A child of either;
>> (3) A person residing in the household of either; or
>> (4) A third person committed in the course of committing a crime against any of them.

Additionally, we have recognized a "joint-participant exception to the marital communication privilege[.]" *State v. Witchey*, 388 N.W.2d 893, 895 (S.D. 1986).

[¶20.]    The State relies on *United States v. Nash,* to assert that privilege is lost when a spouse secretly records a conversation and turns it over to law enforcement. 910 F. Supp. 2d 1133, 1146 (S.D. Ill. 2012). In *Nash*, the defendant's wife recorded a conversation between them "without defendant's knowledge and prior to defendant's wife communicating with law enforcement." *Id.* at 1144. She subsequently gave the tape to the FBI. *Id.* She "informed the FBI that she made the recording following an incident where defendant had physically abused her for refusing to be involved with defendant's plan." *Id.* The court allowed the communication to be admitted because two exceptions to the marital communications privilege existed. First, it found the "long recognized exception for circumstances where the husband commits an offense against the wife applies in this case." *Id.* Second, the court found that the joint-participant exception applied. *Id.*

[¶21.]    The State's reliance on *Nash* is misplaced as neither of the exceptions in *Nash* exist in this case. The State concedes that "Defendant was not attempting to force his wife into criminal activity during the recorded conversation[.]" Further, we require "active participation in, or furtherance of, patently criminal activity by the witness-spouse" before we apply the "joint-participant" exception to marital communications. *Talarico*, 2003 S.D. 41, ¶ 36, 661 N.W.2d at 23. "The testifying spouse must be more than a receptor of a statement from the spouse that committed the crime." *Id.* Lastly, Defendant was not charged with an offense against his wife in this proceeding, and therefore the first exception of Rule 504(d) does not apply.

[¶22.]      The State next asserts that the privilege was lost because Defendant is "charged with a crime against the person or property of . . . a child of either[.]" 19-19-504(d)(2). The State contends that an unborn child falls under the scope of Rule 504(d); Defendant contends that a separate definition of unborn child in criminal statutes and enumeration of unborn child in other statutes indicates an intent not to include an unborn child under the definition of child. We note that we are interpreting our own evidentiary rule rather than a legislatively adopted statute.

[¶23.]      SDCL 19-19-504(d)(2) provides that there is no spousal privilege "in a proceeding in which one spouse is charged with a crime against the person or property of . . . [a] child of either[.]" We have previously applied statutory rules of construction to our rules. *See Discover Bank v. Stanley*, 2008 S.D. 111, ¶ 15, 757 N.W.2d 756, 761. Therefore, "[w]ords and phrases in [the rule] must be given their plain meaning and effect." *State v. Moss*, 2008 S.D. 64, ¶ 15, 754 N.W.2d 626, 631 (quoting *Goetz v. State*, 2001 S.D. 138, ¶ 16, 636 N.W.2d 675, 681).

[¶24.]      At the time the language in SDCL 19-19-504(d)(2) was adopted by this Court in 1978, the ordinary and popular meaning of "child" included "an unborn or recently born human being[.]" *See Webster's Third New International Dictionary* 388 (4th ed. 1976). More recent dictionaries also support this meaning. *See American Heritage College Dictionary* 243 (3rd ed. 1997) ("A human fetus"); *Black's Law Dictionary* 290 (10th ed. 2014) ("A baby or fetus"). Because the ordinary and popular meaning of the word child has included unborn children at and since the time we adopted the exception, it applies to communications involving crimes against the unborn children of either spouse. Defendant's paternity is not disputed

in this case. Therefore, admission of the spousal call under this exception was appropriate.

[¶25.] However, Defendant also contends that admission of the spousal call violated his right to confrontation. The United States Supreme Court has held that the Confrontation Clause of the Sixth Amendment of the United States Constitution "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination.'" *State v. Johnson*, 2009 S.D. 67, ¶ 18, 771 N.W.2d 360, 368 (quoting *Crawford v. Washington*, 541 U.S. 36, at 53-54, 124 S. Ct. 1354, 1365, 158 L. Ed. 2d 177 (2004)). We review this "assertion of a violation of a constitutional right under the de novo standard of review." *Id.* ¶ 10, 771 N.W.2d at 365.

[¶26.] It is undisputed that Melissa was unavailable in that she failed to appear despite a subpoena and Defendant had not previously cross-examined her. Therefore we must determine whether the statements made by Melissa are testimonial hearsay. We initially determine whether they are testimonial in nature. When considering whether a statement is testimonial, the Supreme Court has held that "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'create an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, ___U.S.___, 135 S. Ct. 2173, 2180, ___L. Ed. 2d. ___(2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155, 179 L. Ed. 2d 93 (2011)). In this case, we must determine whether Melissa's phone call and "statements were made with the primary purpose of creating evidence for [Defendant's] prosecution." *Id. at* ___, 135 S. Ct. at 2181. The

detective testified that he told Melissa that he was trying to find out if Defendant put anything in Komes's drinks. Prior to the recording, he told her about pennyroyal and what it was that he needed from the phone call. He also explained that he coached her along at certain points in the conversation. In light of all of these circumstances, there is no indication that the primary purpose of the phone call or Melissa's statements was anything other than to obtain incriminating information from Defendant and gather evidence for Defendant's prosecution. The detective testified that it was not until after the phone call that he felt the "case was solid;" he thought he finally had enough evidence for probable cause to obtain an arrest warrant.

[¶27.] The State contends that Melissa's statements are not hearsay because they were not offered for the truth of the matter asserted but rather provided the context for other admissible statements. *See Johnson*, 2009 S.D. 67, ¶ 21, 771 N.W.2d at 369. Further, the State points out that the court instructed the jurors that they could not consider the statements by Melissa. Such an instruction was not sufficient in this case. Melissa's statements are too intricately woven into the conversation to be ignored. She repeatedly prompted Defendant with numerous details and provides all of the material substance and content necessary to make Defendant's statements meaningful. Therefore, we agree with Defendant that the court erroneously admitted the call because Melissa's statements were testimonial hearsay subject to the Confrontation Clause in the Sixth Amendment.

[¶28.] Once a violation of the Confrontation Clause has occurred the question "becomes whether the admission was harmless error. It is during *this* phase of the

analysis where a court is allowed to consider corroborating evidence." *State v. Frazier*, 2001 S.D. 19, ¶ 30, 622 N.W.2d 246, 258. The erroneous admission of this phone call was not harmless because it allowed the jury to hear Defendant admitting that he put pennyroyal into Komes's drinks on two different occasions. Although the State argues that the testimony of other witnesses and results of the contaminated beverages established the same thing, this phone call was the only admission by Defendant to any witness that he put pennyroyal in Komes's drinks. He had indicated to the other witnesses that it was cohosh that he was secretly adding to her drinks. Therefore, we also reverse based on the circuit court's admission of the recorded phone call.

*Evidence of other acts*

[¶29.] Finally, Defendant contends that the circuit court erred by improperly admitting other act evidence under SDCL 19-19-404(b).[8] The court admitted Toavs' and her daughter's testimony that Defendant provided Toavs with a bitter substance to induce labor and told her at the exchange of that substance that he was putting it in Komes' drinks.

[¶30.] "Evidentiary decisions of a [circuit] court are presumed correct." *State v. Owen*, 2007 S.D. 21, ¶ 9, 729 N.W.2d 356, 362. We review the circuit court's decision for an abuse of discretion. *State v. Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d

---

8. Rule 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

315, 320. When determining if prior acts should be admissible, the circuit court must employ a two-part balancing on the record. *Owen*, 2007 S.D. 21, ¶ 14, 729 N.W.2d at 362-63. "First, the offered evidence must be relevant to a material issue in the case. Second, the [circuit] court must determine 'whether the probative value of the evidence is substantially outweighed by its prejudicial effect.'" *Id.* (quoting *State v. Jones*, 2002 S.D. 153, ¶ 10, 654 N.W.2d 817, 819). Other acts evidence "is admissible when similar in nature and relevant to a material issue, and not substantially outweighed by its prejudicial impact." *Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d at 320.

[¶31.]    The State offered the evidence to show common scheme or plan, knowledge, or lack of mistake. The court conducted the required balancing on the record. It found that the evidence was relevant because the State's theory was that Defendant was poisoning or attempting to poison Komes by putting the substances of cohosh—which has a bitter taste—and pennyroyal—which has a minty taste—in her drinks. The court explained that the evidence was "relevant to show that Defendant had knowledge of blue and/or black cohosh and that he had previously used the substance to induce labor through herbal stimulation with reference to his giving the substance to Toavs and this constitutes a common scheme or plan evidence." Further the court found that "the danger of unfair prejudice of the evidence does not substantially outweigh the probative value of the evidence."

[¶32.]    Defendant's prior encounter with Toavs and her daughter has sufficient points in common with the alleged conduct. It demonstrates that he had knowledge that ingestion of herbal substances affect a pregnancy, such as by

inducing labor. He recommended that the substance be placed in drinks, just as was alleged in this case. Further, he admitted at the exchange that he was putting the substance that he gave Toavs into Komes's drinks. Toavs testified that the substance Defendant gave her was bitter. Komes also testified that her drinks tasted bitter. The circuit court did not abuse its discretion by admitting the evidence.

## Conclusion

[¶33.] Because the jury was erroneously instructed on the elements of attempted fetal homicide and the court erroneously admitted a spousal communication, we reverse the conviction. In light of our decision, we do not reach Defendant's remaining issues regarding expert testimony and sufficiency of the evidence.

[¶34.] GILBERTSON, Chief Justice, and ZINTER and WILBUR, Justices, and PALMER PERCY, Circuit Court Judge, concur.

[¶35.] PALMER PERCY, Circuit Court Judge, sitting for KERN, Justice, disqualified.